# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D23-492
Lower Tribunal No. 20-CA-002396

_____

PEOPLE'S TRUST INSURANCE COMPANY,

Appellant/Cross-Appellee,

v.

PAUL GUNSSER,

Appellee/Cross-Appellant.

_____

Appeal from the Circuit Court for Lee County.
Sherra Winesett, Judge.

November 9, 2023

TRAVER, C.J.

People's Trust Insurance Company ("People's Trust") and Paul Gunsser both appeal the final judgment entered in Gunsser's favor.[1]  Water overflow from a deteriorated cast iron plumbing system damaged Gunsser's home.  But Gunsser's homeowner's insurance policy did not cover the costs to tear out and fix his home's

---

[1] This case was transferred from the Second District Court of Appeal to this Court on January 1, 2023.  We have jurisdiction. *See* Fla. R. App. P. 9.030(b)(1)(A), 9.110(g).

concrete slab to access the system. This is because a water damage exclusion ("WDX") endorsement overwrote the original policy provision that would have covered Gunsser's loss caused by water discharging from his plumbing system and the tear out and replacement costs to access the deteriorated pipes. The WDX endorsement applied here because the deterioration, rust, and corrosion that caused the plumbing system's deterioration is "an act of nature." While Gunsser bought a limited water damage coverage ("LWD") endorsement that modified the WDX endorsement and covered his sudden and direct accidental water damage up to $10,000, the LWD endorsement did not include tear out and replacement costs coverage. In finding that the WDX endorsement applies, we affirm the trial court's ruling on this issue. And in concluding the LWD endorsement did not cover tear out and replacement costs, we reverse the trial court's final judgment with instructions to enter an amended final judgment excluding these damages.

## I.   Background and Operative Policy Provisions

People's Trust insured Gunsser under an all-risk policy. As a typical all-risk policy, Gunsser's policy covered all losses unless specifically excluded. *See, e.g., Kokhan v. Auto Club Ins. Co. of Fla.*, 297 So. 3d 570, 572 (Fla. 4th DCA 2020). For this loss, four policy sections are at issue. The first two sections set the initial scope of People's Trust's coverage if the plumbing leak warranted tear out and replacement of Gunsser's concrete slab to access the corroded plumbing system. Under those

sections, the water loss **and** tear out and replacement costs would be covered under the policy. The last two sections of the policy, the WDX and LWD endorsements, however, overrode the first two sections to exclude tear out and replacement costs.

*First policy section.* The first section of Gunsser's policy outlined the basic parameters of what the policy covered and excluded. It insured "against direct physical loss to property," including Gunsser's dwelling. But the policy excluded, among other occurrences, any loss caused by wear and tear, rust, or other corrosion. Thus, because rust and corrosion damaged Gunsser's cast iron plumbing system, he would have no coverage but for a significant exception. That exception created coverage for discharge or overflow from a plumbing system **and** added coverage for tear out and replacement of any part of Gunsser's house necessary to access and fix the system. Thus, the scope of the exception is significant. By its nature, the subsequent destruction and replacement of a concrete slab, unaffected by a water leak, is not a "direct physical loss to property." It is, rather, indirect or ancillary. Even so, the first policy section illustrates that without the WDX endorsement, there was no question that People's Trust agreed to pay for Gunsser's tear out and replacement costs "unless the loss was otherwise excluded":

3

**SECTION I – PERILS INSURED AGAINST**
**A. Coverage A – Dwelling and Coverage B – Other Structures**
1. We insure against risk of *direct physical loss*[2] to property described in Coverages A and B.
2. We do not insure, however, for loss:
   . . . .
   c. Caused by:
   . . . .
   **(5)** Any of the following:
   **(a)** *Wear and tear*, marring, deterioration;
   **(b)** Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;
   **(c)** Smog, *rust or other corrosion*;
   . . . .
   **Exception to c. (5)**
   *Unless the loss is otherwise excluded*, we cover loss to property covered under Coverage **A** or **B** resulting from *accidental discharge or overflow of water* or steam within a:
   **i.** Storm drain, or water, steam or water pipe, off the "residence premises"; or
   **ii.** *Plumbing*, heating, air conditioning or automatic fire protective sprinkler *system* or household appliance *on the "residence premises". This includes the cost of tearing out and replacing any part of a building necessary to repair the system or appliance.* However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

*Second policy section.* The second policy section at issue, standing alone, did not alter coverage here. It merely defined "water" in a manner that did not affect

---

[2] The underlined and italicized portions of the policy excerpts are added for emphasis throughout this opinion.

People's Trust's obligation to cover Gunsser's loss, including his tear out and replacement costs:

> **SECTION I – EXCLUSIONS**
> **A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> . . . .
>
> **3. Water**
> This means:
> **a.** Flood, surface water, waves, including tidal water and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;
> **b.** Water which:
> **(1)** Backs up through sewers or drains; or
> **(2)** Overflows or is otherwise discharged from a sump, sump pump or related equipment.
> **c.** Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.
>
> . . . .

Indeed, rust and corrosion caused Gunsser's toilet to overflow, and not a tsunami, a sump pump discharge, or a swimming pool leak.

*Third policy section: WDX endorsement.* But, for a $151 premium credit, Gunsser contracted with People's Trust to modify the definition of "water." The third policy section at issue, the WDX endorsement, replaced the policy's water exclusion. It now defined water to mean, among others, discharge or overflow of

5

water from Gunsser's plumbing system, as long as "human, animal forces, or any act of nature" caused it:

**WATER DAMAGE EXCLUSION**

**THIS ENDORSEMENT CHANGES YOUR POLICY,
PLEASE READ IT CAREFULLY**

*For a premium credit, your policy is changed as follows*:

. . . .

*Under **SECTION I – EXCLUSIONS** item **3**. Water is replaced by the following*:

**3.** Water, meaning:
   . . . .
   **e.** *Discharge or overflow of water* or steam *from within a plumbing*, heating, air conditioning or automatic fire protective sprinkler *system* or from within a household appliance; . . .
   . . . .
   *caused by or resulting from human or animal forces or any act of nature*.

All other provisions of your policy that are not affected by this endorsement remain unchanged.

Gunsser disputes that corrosion is an "act of nature." If it is not, the WDX endorsement does not apply, and Gunsser's loss—including tear out and replacement costs—is not "otherwise excluded" by his original policy. If corrosion is an "act of nature," then the WDX endorsement would leave Gunsser uncovered.

*Fourth policy section: LWD endorsement.* But a fourth policy section could prevent this outcome, because for an additional $91 premium, Gunsser bought back

6

limited water damage coverage via the LWD endorsement. This endorsement covers "[s]udden and accidental direct physical loss" due to water discharge from within a plumbing system. But critically, the parties agreed to limit this type of loss only to "covered property" and a set amount per occurrence:

**LIMITED WATER DAMAGE COVERAGE**

**THIS ENDORSEMENT CHANGES YOUR POLICY,
PLEASE READ CAREFULLY**

**AGREEMENT**
"We" will provide the insurance described in this endorsement in return for an additional premium paid by "you" and "your" compliance with all applicable provisions of this policy.

The policy is endorsed to provide the following:

*Sudden and accidental direct physical loss to covered property by discharge or overflow of water* or steam *from within a plumbing*, heating, air conditioning or automatic fire protective sprinkler *system* or from within a household appliance.

**LIMIT OF LIABILITY:**
*The Property Coverage limit for liability for all covered property provided by this endorsement is shown on your Declaration Page, per occurrence.*

This coverage does not increase the Property Coverage limit(s) of liability that apply to the damaged covered property.

*All other provisions of your policy that are not affected by this endorsement remain unchanged.*

The policy's Declaration Page provided for $10,000 in coverage per LWD occurrence.

People's Trust insists that the LWD endorsement only covers Gunsser's water damage and not his tear out and replacement costs. Gunsser responds that the LWD endorsement is ambiguous on tear out and replacement coverage, and therefore, we should construe the policy in his favor. Alternatively, Gunsser claims that because the LWD endorsement is silent on tear out and replacement costs, the first policy provision covering these items still applies.

The parties framed their interpretive arguments below through competing summary judgment motions. The trial court determined that the WDX endorsement applied because corrosion was an "act of nature." But it interpreted the LWD endorsement to include tear out and replacement costs. The case proceeded to trial, where a jury awarded Gunsser water damages of less than $10,000 and vastly larger tear out and replacement costs necessary to fix his plumbing system. The trial court ultimately entered judgment in Gunsser's favor.

## II. Standard of Review and Applicable Insurance Law

We review the policy de novo, guided by the principle that its text is paramount. *See Gov't Emps. Ins. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017); *Auto-Owners Ins. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Indeed, we interpret insurance contracts according to their plain language, as bargained for by the parties. *See Auto-Owners Ins.*, 756 So. 2d at 34. We read the policy as a whole, endeavoring to give each provision its full meaning and operative effect. *See U.S. Fire Ins. v.*

8

*J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007); *see* § 627.419(1), Fla. Stat. (2019) (requiring every insurance contract "be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto"). We will, however, liberally construe any ambiguity remaining in favor of coverage and against People's Trust. *See Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 949–50 (Fla. 2013). A provision is ambiguous if it is "susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage." *Fayad v. Clarendon Nat'l Ins.*, 899 So. 2d 1082, 1086 (Fla. 2005).

## III. Legal Analysis

The trial court correctly determined the WDX endorsement applied because corrosion is an "act of nature." It erred, however, in concluding that the LWD endorsement covers tear out and replacement costs. The LWD endorsement only applies to "covered property" that suffers "[s]udden and accidental direct physical loss." The policy initially covered these ancillary losses unless they were "otherwise excluded." The WDX endorsement did precisely that, and regardless, ancillary slab damage caused by tear out is not a direct physical loss, much less a sudden and accidental one. The policy thus does not cover tear out and replacement costs, and an amended final judgment must exclude them.

A.    *The WDX endorsement applies because corrosion is an "act of nature."*

The WDX endorsement applied to Gunsser's claim for water damage because corrosion to his cast iron plumbing system was an "act of nature." Gunsser disagrees, claiming that the policy does not define "act of nature," and that we should find this phrase synonymous with "act of God." Gunsser contends an "act of God" is an uncontrollable or unpreventable event like a hurricane, tornado, or flood, and not a natural process like corrosion. He also categorizes it as a "term of art" in insurance policies, and accordingly, relies on Black's Law Dictionary, an insurance treatise, and federal case law to define it instead of non-legal dictionaries and case law from other states. He argues that at best, "act of nature" is ambiguous, and we should therefore construe it in his favor.

Three of our sister courts have rejected Gunsser's arguments. *See Dodge v. People's Tr. Ins.*, 321 So. 3d 831 (Fla. 4th DCA 2021), *Rosa v. Safepoint Ins.*, 350 So. 3d 468 (Fla. 5th DCA 2022); *Santana v. People's Tr. Ins.*, 366 So. 3d 1130 (Fla. 3d DCA 2023). The *Dodge* court analyzed identical policy language on the same facts. *See Dodge*, 321 So. 3d at 832–33. As here, the parties agreed that corrosion caused the insureds' plumbing leak. *See id.* at 832. Because "act of nature" is not defined in the policy, the *Dodge* court analyzed both legal and non-legal dictionary definitions to find the ordinary meaning of "act of nature." *See id.* at 833–34; *see also Macedo*, 228 So. 3d at 1113 ("When a term in an insurance policy is undefined,

10

it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning."). Citing two out-of-state cases,[3] the *Dodge* court concluded that the ordinary meaning of "act of nature" is "something that naturally occurs" and includes ordinary natural processes like rust or corrosion—"the chemical reaction between iron and moist air." *Dodge*, 321 So. 3d at 834–35 (noting "rust" is defined as "reddish brittle coating formed on iron especially when chemically attacked by moist air" and "corrosion" is defined as "the action, process, or effect of corroding," which is "to wear away gradually by chemical action" (quoting *Rust* and *Corrosion*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003))). It does not require an uncontrollable or unpreventable event. *See id*. at 835.

The *Rosa* court, analyzing similar policy language in an identical factual context, adopted *Dodge*'s reasoning and its definition for "act of nature" as "something that naturally occurs." *Rosa*, 350 So. 3d at 470. It also noted the operative policy separately referenced "an Act of God" more than once. This undermined the insured's argument that the definitions of "an act of God" and "any

---

[3] *See Holben v. GC Acquisition Corp.*, No. 1996-CA-261, 1997 WL 115843, at *2 (Ohio Ct. App. Mar. 3, 1997) (natural accumulation of snow and ice on rooftop); *Coyle v. City of Waterbury*, No. 96884, 1991 WL 270291, at *1 (Conn. Super. Ct. Dec. 8, 1991) (growth of tree root into abutting sidewalk); *see also Bibeau v. Concord Gen. Mut. Ins.*, 244 A.3d 712, 714 (Me. 2021) (gradual earth movement below home's foundation).

11

act of nature" were interchangeable. *See id*. at 471 (citing *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 171 (Fla. 1st DCA 2015) ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 170 (2012)))).[4]

We find the *Dodge* and *Rosa* courts' reasoning persuasive. Here, context is key. The only contextually reasonable meaning of "act of nature" is "something that naturally occurs," and therefore, includes a naturally occurring process like rust and corrosion. *See Dodge*, 321 So. 3d at 834–35; *Rosa*, 350 So. 3d at 471; *see also* Scalia & Garner, *supra*, at § 70 ("Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended. One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

At bottom, Gunsser's alternative interpretation requires us to view "an act of nature" synonymously with "an act of God," or an uncontrollable or unpreventable event. We do not look solely to legal dictionaries like Black's Law Dictionary to find the plain and ordinary meaning of an undefined insurance policy term like "act

_____

[4] The *Santana* court followed *Dodge* and *Rosa* in a citation opinion. 366 So. 3d at 1130. Later, in a case involving identical policy language and a similar fact pattern, the Third District emphasized that it had "chosen to follow the precedent set by *Dodge* and *Rosa*." *See People's Tr. Ins. v. Banks*, 48 Fla. L. Weekly D1819, D1820 (Fla. 3d DCA Sept. 13, 2023).

of nature." *See Macedo*, 228 So. 3d at 1113 (quoting *Botee v. S. Fid. Ins.*, 162 So. 3d 183, 186 (Fla. 5th DCA 2015)). Non-legal dictionaries are also fair game. *Id.* So, we reject Gunsser's invitation to stop with Black's Law Dictionary and go no further. Black's Law Dictionary is not contextually appropriate here. It defines "act of God" inconsistently with the circumstances and references broadening the definition based on an inapplicable federal statute:

> *[A]n overwhelming, unpreventable event* caused exclusively by forces of nature, such as an earthquake, flood, or tornado. *The definition has been statutorily broadened* to include all natural phenomena that are exceptional, inevitable, and irresistible, the effects of which could not be prevented or avoided by the exercise of due care or foresight. 42 USCA § 9601(1). – Also termed *act of nature* . . . .

*Act of God*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

We cannot rely on Gunsser's cited insurance treatise either, because it does not define "act of nature." *See* 11 Couch on Insurance § 153:3 (3d ed. 2023) (defining "forces of nature" and "natural processes"). Gunsser's federal case law also provides no help because every situation involved an "act of God." *See Legree v. United States*, No. 5:05-CV-173-SPM, 2006 WL 2190580 (N.D. Fla. July 31, 2006) (tornado during hurricane destroys warehouse facility); *Chartis Prop. Cas. Co. v. Inganamort*, Civ. No. 12-040075, 2019 WL 1277518 (D.N.J. Mar. 20, 2019) (unpublished) (boat sinks during heavy rain, lightning, and heavy thunderstorms); *Fed. Ins. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 699 (S.D.N.Y. 2008) (megayacht

13

capsizes amid extreme weather), *aff'd sub nom.*, 340 F. App'x 5 (2d Cir. 2009); *see also Rivera-Carraquillo v. Centro Ecuestre Madrigal, Inc.*, 812 F.3d 213, 227 n.25 (11th Cir. 2016) (plaintiff flung from horse is force majeure or superior force).

Instead, the Fourth and Fifth Districts' examinations of non-legal dictionary definitions and applicable case law in *Dodge* and *Rosa* to analyze the phrase's usage provides a better process to determine the contextual meaning of "act of nature." And in the context of this policy, we agree with *Dodge* and *Rosa* that the everyday interpretation of the phrase "act of nature" means "something that naturally occurs," rather than an uncontrollable or unpreventable event, such as a hurricane, flood, or tornado, usually classified as an "act of God." *See Rosa*, 350 So. 3d at 471 (determining that "any 'act of nature' is an act that occurs naturally and encompasses rust or other corrosion"); *Dodge*, 321 So. 3d at 834 (agreeing with insurer that "ordinary meaning of the term 'act of nature' is something that naturally occurs"); *see also People's Tr. Ins. v. Banks*, 48 Fla. L. Weekly D1819, D1820 (Fla. 3d DCA Sept. 13, 2023) (agreeing with *Dodge* and *Rosa* that phrase "act of nature" used in insurance policy included ordinary natural processes).

Even if we construed some overlap between the definitions of "act of nature" and "act of God," additional contextual clues in Gunsser's policy preclude the finding of an ambiguity. Gunsser's policy specifically references "an Act of God" more than once in its Cancellation and Nonrenewal sections. We agree with the

14

*Rosa* court that the separate uses of "an Act of God" and "any act of nature" in the same policy connote different meanings of the terms. *See Rosa*, 350 So. 3d at 471; *see also Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. 2d DCA 2006) ("As a general proposition, the use of different language in different contractual provisions strongly implies that a different meaning was intended."). For these reasons, the trial court correctly ruled that it could not read "act of nature" synonymously with "act of God." In context, synonymous interpretation is unreasonable. The only contextually reasonable definition of "act of nature" in this specific insurance policy is "something that occurs naturally" that is not necessarily an "act of God." Gunsser's WDX endorsement therefore excluded any coverage here. Accordingly, we must now analyze the LWD endorsement.

> B. *The LWD endorsement provides water loss coverage that does not include tear out and replacement costs.*

The LWD endorsement's coverage does not include tear out and replacement costs because they are not "covered losses," much less "[s]udden and accidental direct physical losses." Unlike the first policy section, the LWD endorsement does not mention tear out and replacement costs. And we cannot conclude that the destruction of a concrete slab and its subsequent replacement following a water leak are direct, sudden, or accidental. By their nature, they are instead indirect, delayed, and purposeful. The LWD endorsement's plain language, therefore, does not cover tear out or replacement costs.

We therefore reject Gunsser's contention—grounded in a Fifth District decision with different LWD endorsement language—that this provision is ambiguous. *See Sec. First Ins. v. Vazquez*, 336 So. 3d 350, 352 (Fla. 5th DCA 2022); *see also Sec. First Ins. v. Nichols*, 363 So. 3d 1172 (Fla. 6th DCA 2023) (citation opinion to *Vazquez*). Like Gunsser's policy, the *Vazquez* policy covered tear out and replacement costs in connection with water damage not otherwise excluded from a plumbing system. *See Vazquez*, 336 So. 3d at 352. But *Vazquez* is different from this case in at least two ways.

First, we agree with our sister courts that we can distinguish *Vazquez* because, unlike here, the parties stipulated that the LWD endorsement included tear out and replacement costs. *See Vazquez*, 336 So. 3d at 352; *Panettieri v. People's Tr. Ins.*, 344 So. 3d 35, 41 (Fla. 4th DCA 2022); *Bank*s, 48 Fla. L. Weekly at D1821.

Second, the LWD endorsement's language in *Vazquez* differs significantly from the language in the LWD endorsement here:

| Gunsser: | *Vazquez*: |
|---|---|
| "The Property Coverage limit _for liability_ _for all covered property_ provided by this endorsement is shown on "your" Declaration page, per occurrence." (Emphasis added). | "The limit of liability _for all damage to covered property_ provided by this endorsement is $10,000 per loss. This coverage does not increase the limit of liability that applies to _the damaged covered property_." (Emphasis added). |

The *Vazquez* court noted that the LWD endorsement there limited liability for "all damage to covered property" while observing that the water leak did not damage the

16

concrete slab. 336 So. 3d at 353. It also remarked that if the insurer had wished to tie the limitation of liability to that part of the property damaged by water, it could have used the term "water damage loss" instead of "damage to covered property." *Id*. Finally, it opined that even if a water damage loss included both direct damage to covered property and indirect damage in the form of tear out costs, there was no reason why an LWD endorsement necessarily applied to both categories of loss. *Id*. On the other hand, the *Vazquez* court reasoned that "damage to covered property" could also include tear out costs because the insured's concrete slab would be damaged in connection with the plumbing repairs. *Id*. Based on these observations, the *Vazquez* court concluded that the LWD endorsement drafted by the insurer was ambiguous, and therefore, it should be interpreted in the insured's favor. *Id*.

Here, the LWD endorsement limits recovery "for liability for all covered property." It does not raise the ambiguity of what "damage" means in connection with a subsequent slab repair; it only asks whether the loss is covered. In this sense, People's Trust accepted the *Vazquez* court's tacit invitation to define its liability limits more clearly. *Id*. Unlike *Vazquez*, Gunsser's LWD endorsement is clear and unambiguous; it does not cover tear out and replacement costs.

The policy's plain language also impedes Gunsser's argument that tear out and replacement costs are covered despite what the LWD endorsement unquestionably declares. The policy's only reference to tear out and replacement

17

costs is in the first policy section, and that provision only applies "[u]nless the loss is otherwise excluded." When Gunsser agreed to the WDX endorsement in exchange for a lower premium, his amended policy did not just exclude tear out and replacement costs suffered in connection with a plumbing leak, but **all** water damage from leaks in his plumbing system caused by human or animal forces or any act of nature. The WDX endorsement, therefore, "otherwise excluded" water damage coverage in the first policy section, and Gunsser's exclusive coverage for this type of loss now comes only from the LWD endorsement. Put differently, the LWD endorsement's silence on tear out and replacement costs does not resurrect the first policy section's inclusion of them.

We are not the first to interpret this policy language, and our sister courts share our interpretation. *See Panettieri*, 344 So. 3d at 39–40 ("A plain reading of the exception to [the first policy section] indicates that tear out coverage is included as part of the loss to property unless the loss is excluded. Therefore, no separate and distinct coverage exists for tear out costs apart from water damage."); *Banks*, 48 Fla. L. Weekly at D1820–21 (holding that limited water damage coverage endorsement did not cover "tear out" costs associated with replacement of insured homeowners' old cast iron plumbing pipes after pipes caused water damage; endorsement only covered sudden and accidental direct physical loss by water). Gunsser is therefore

18

entitled to recover for his water damage loss, but not his ancillary tear out and replacement costs.

## IV. Conclusion

For these reasons, we affirm the trial court's ruling that the WDX endorsement applies but reverse its determination that the LWD endorsement includes tear out and replacements costs. These determinations moot People's Trust's remaining appellate arguments relating to the trial. We remand for entry of an amended final judgment that does not include tear out and replacement costs.

AFFIRMED in part; REVERSED in part; and REMANDED.

GANNAM, J., concurs.
MIZE, J., concurs specially, with opinion.

_____

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF TIMELY FILED

_____

MIZE, J., concurring specially, with opinion.

I fully concur in Section II and Section III.B. of the majority's opinion. As to the remainder of the opinion, I concur in result only.

_____

Mark D. Tinker and Francesca M. Stein, of Cole, Scott & Kissane, P.A., Tampa, for Appellant/Cross-Appellee.

Mark A. Nation, of The Nation Law Firm, Longwood, Raymond T. Elligett, Jr., of Buell & Elligett, P.A., for Appellee/Cross-Appellant.

19